OPINION
Appellant, George Muenster, D.O., appeals from a judgment of the Lake County Court of Common Pleas, granting a new trial to appellees, Donald L. Kitchen, Jr., the administrator of the Estate of Alfreda A. Kitchen ("the decedent"), following a jury verdict in favor of appellant. After reviewing the record before us, we reverse the judgment of the trial court and remand the matter for entry of judgment consistent with the jury verdict returned in this case.
In July 1998, the decedent became a resident of Wickliffe Country Place, a nursing home, primarily because she suffered from rheumatoid arthritis and was unable to care for herself. The decedent had been appellant's patient since 1963. While the decedent resided in the nursing home, appellant continued to act as her treating physician.
When the decedent entered Wickliffe Country Place, she had been receiving Coumadin. In general terms, Coumadin is a blood thinner that requires monitoring by specific blood tests on a periodic basis. These blood tests were needed in order to adjust the dosage of Coumadin if needed.
Appellant ordered the nurses at Wickliffe Country Place to conduct these blood tests every Wednesday. On July 29, 1998, the nurses administered these tests and faxed the results to appellant.[1]
Thereafter, the decedent continued to receive Coumadin at the dosage prescribed by appellant even though the nurses apparently failed to conduct the subsequent weekly blood tests. Likewise, appellant did not receive any reports concerning the blood test results. Had appellant's orders been followed by the nurses, then the tests would have been performed on August 5, 12, and 19, 1998. During this time, appellant made no further effort to check up on the decedent.[2] Neither did appellant attempt to determine whether the nurses administered the blood tests every Wednesday.
In the early morning hours of August 19, 1998, the decedent was found in distress. After the nurses notified appellant, the decedent was transported to Mt. Sinai Hospital East in Richmond Heights, Ohio.[3]
While in the hospital, it was discovered that the decedent was bleeding from her lungs due to the toxic levels of Coumadin in her body.
Over the next several days, the decedent continued to gradually deteriorate. Ultimately, she went into renal failure and later lapsed into a coma. The decedent died shortly thereafter on August 26, 1998, at the age of seventy-six. According to appellant, the decedent died as a direct result of the toxic levels of Coumadin, which caused her to hemorrhage.
As a result of these events, appellees filed suit against both appellant and Wickliffe Country Place, alleging negligence and wrongful death arising from the medical care received by the decedent while in the nursing home. After appellees settled with Wickliffe Country Place, the case proceeded solely against appellant. Following trial, the jury returned a verdict in favor of appellant.
In response to the verdict, appellees moved for a new trial, or, alternatively, for a judgment notwithstanding the verdict, arguing that the jury's verdict was against the manifest weight of the evidence. Specifically, appellees maintained that the jury failed to act in accord with the evidence which demonstrated that appellant had a responsibility to follow up and make sure that his orders were fulfilled by the nurses at Wickliffe Country Place. Additionally, appellees claimed that the jury failed to follow the jury instruction concerning the negligence and responsibilities of doctors and nurses. According to appellees, if the jury found the nurses negligent in failing to follow appellant's orders, then the jury should have also found appellant negligent on the basis that he controlled the performance of the nurses.
Appellant filed a brief in opposition to appellees' request for a new trial contending that the jury verdict was not against the manifest weight of the evidence. According to appellant, the jury determined the credibility of the witnesses. As such, the jury apparently found the testimony presented by appellant and his expert concerning the appropriate standard of care to be more credible than that of appellees' expert. Furthermore, appellant claimed that there was absolutely no evidence to establish that he had a right to control or direct the performance of the nurses beyond the issuance of the orders in question; thus, the negligence of the nurses could not be imputed to appellant.
In a judgment entry dated February 28, 2000, the trial court granted appellees' motion for a new trial while denying their motion for judgment notwithstanding the verdict. The trial court provided the following rationale for its decision:
 "[I]t is clear that the jury failed to consider the concurrent negligence of the nurse's [sic] and the attending physician in rendering its decision. The jury lost its way and disregarded relevant testimony, as well as, this court's instruction in finding for defendant as plaintiff presented clear evidence of damages proximately caused by defendant's negligence. In the present case, the jury's verdict cannot be sustained by the weight of the evidence and a new trial is warranted under Civ.R. 59(A)(6). * * *" (Emphasis added.)[4]
From this judgment appellant filed a notice of appeal and asserts a single assignment of error for our consideration:
 "The trial court erred and abused its discretion in granting plaintiff's [sic.] motion for new trial [.]"
 Under the single assignment of error, appellant presents numerous arguments. First, appellant maintains the jury's verdict was supported by competent, credible evidence. According to appellant, evidence was presented to show that he properly ordered the nurses at Wickliffe Country Place to conduct weekly blood tests and that he had no duty to independently follow up and make sure the nurses obeyed his orders.[5]
Similarly, he argues that, beyond the issuance of treatment orders, there was no evidence that he had a right to direct and control the actions and performance of the nurses; hence, there could be no imputed negligence.
It is well-settled that the decision to grant a motion for a new trial under Civ.R. 59(A) rests with the sound discretion of the trial court.Malone v. Courtyard by Marriott L.P. (1996), 74 Ohio St.3d 440, 448. As such, the standard of appellate review on a motion for new trial is an abuse of discretion. Id. This standard requires an appellate court to "`view the evidence favorably to the trial court's action rather than to the original jury's verdict.'" Id., quoting Rohde v. Farmer (1970),23 Ohio St.2d 82, 94. "This deference to a trial court's grant of a new trial stems in part from the recognition that the trial judge is better situated than a reviewing court to pass on questions of witness credibility and the `surrounding circumstances and atmosphere of the trial.'" Id.
Furthermore, in Charter Express, Inc. v. Indep. Ins. Serv. Corp. (Apr. 10, 1992), Portage App. No. 91-P-2296, unreported, 1992 WL 190184, at 12, this court discussed the standard for granting a new trial:
 "`In deciding a motion for a new trial based on the weight of the evidence, the trial court must weigh the evidence and pass upon the credibility of witnesses. However, the trial court's weighing of the evidence differs from that of the jury in that it is restricted to determining whether manifest injustice has been done and whether the verdict is, therefore, manifestly against the weight of the evidence. The court may not set aside a verdict on the weight of the evidence simply because its opinion differs from the jury's opinion.'" (Citation omitted and emphasis added.) See, also, Poske v. Mergl (1959), 169 Ohio St. 70, 73-74.
 It follows that a trial court "does not undertake to judge the credibility of the evidence, but only to judge whether it has the resemblance of credibility." Verbon v. Pennese (1982), 7 Ohio App.3d 182, 183. Thus, a new trial will not be granted where the verdict is supported by competent, substantial and credible evidence. Id.; Sekston v. Partyka (June 12, 1990), Cuyahoga App. No. 56952, unreported, 1990 WL 84241, at 6. However, "[w]here the evidence is susceptible to more than one construction, a reviewing court is bound to give the evidence the interpretation most consistent with the verdict and judgment." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. See, also, Sekston at 6.
In light of this standard of review, we examine the record to determine whether the jury's verdict was supported by competent, substantial, and credible evidence.
During the trial, appellant testified that he prescribed Coumadin for the decedent and ordered the nurses at Wickliffe Country Place to conduct weekly blood tests.[6] According to appellant, it was the nurses' responsibility to notify the physician of the test results. Once the physician received these test results, he or she could then determine whether to increase, decrease or maintain the same dosage of Coumadin. Although appellant expected the nurses to follow his orders, he admitted that he had "a responsibility" to make sure that his orders were fulfilled.[7] While appellees make much of this statement, when viewed in context, we do not see it as a legal admission that appellant had a duty to follow up on the orders delineated to the nurses, except to monitor any lab report submitted by the nurses.
In an attempt to support appellees' theory that the standard of care imposed a duty upon appellant to follow up and make sure the nurses obeyed his orders, appellees introduced the videotaped testimony of Dr. David Lander ("Dr. Lander"), an emergency room physician. He agreed with appellant to the extent that it was reasonable for him to expect a nurse to follow his orders and that it was a nurse's responsibility to obey a physician's order. Further, in his expert opinion, Dr. Lander stated that the nurses at Wickliffe Country Place, by breaching their standard of care, caused the decedent's death when they failed to adhere to appellant's orders.
However, Dr. Lander went on to explain that the nurses' failure to conduct the blood tests did not absolve a physician of the responsibility to follow up on orders issued to the nurses. In his opinion, appellant's conduct fell below the standard of care and contributed to the death of the decedent because he prescribed Coumadin but failed to monitor its administration appropriately. According to Dr. Lander, appellant should have implemented a procedure or a "tickler system" to ensure that when he prescribed Coumadim, "that he follow up on the test results."
Furthermore, Dr. Lander maintained that, in a situation where two or three weeks passed and a physician has not received laboratory results after ordering weekly tests, that physician had a duty to take some affirmative action. Such action could be to cease prescribing the drug or to inquire why the tests were not conducted.
To counter the testimony provided by Dr. Lander, appellant offered the expert testimony of Dr. Baum, who was both the medical director at Heartland of Mentor Nursing Home in Mentor, Ohio, and a private physician with patients in other nursing homes, including Wickliffe Country Place. Dr. Baum agreed with Dr. Lander's assertion that the nurses at Wickliffe Country Place breached the standard of care and caused the decedent's death because they failed in their responsibility to carry out the orders issued by appellant.
According to Dr. Baum, the standard of care required the nurses at Wickliffe Country Place to contact appellant and tell him that his order for weekly blood testing was not being followed. In other words, if an order was not carried out, then it was a nurse's responsibility to contact the physician and advise him or her of the situation:
 "Q. [by appellees' attorney on cross-examination] And you're telling this jury that if you ordered a test to be done on a weekly basis on a patient who's receiving a potentially toxic or lethal medication you have no responsibility if three weeks or four weeks goes by and you're not given or you haven't received the results of those tests; is that your testimony, Doctor?
"* * *
 "A. [by Dr. Baum] The attending physician relies on the staff of the nursing home to let them know of changes in status, missing a drug dose, patient fall or having a lab that's not done is a change of status and it's the responsibility of the nursing home staff to let you know that that did not occur and when that happens the attending physician has the responsibility to react to that information, you cannot ignore it."[8]
Contrary to Dr. Lander's testimony, Dr. Baum explained that the standard of care did not require appellant to follow up and determine whether the nurses obeyed his orders. Rather, the standard of care required appellant to follow up on the tests he ordered at the time of his nextmonthly visit, unless the nurses advised him of a change of status in the patient.
In Dr. Baum's opinion, the only responsibility appellant had to the decedent while she was at Wickliffe Country Place was to see her once a month, unless there was some significant change in her condition. Thus, Dr. Baum refuted the notion that the standard of care required an attending physician at a nursing home to use a "tickler system" to make sure the nurses followed a physician's order, as suggested by Dr. Lander.
Even after viewing the evidence in favor of the trial court's decision, as required by Malone, we conclude that the court abused its discretion when it granted the motion for a new trial.
As previously indicated, the pleadings, the jury instructions, and the motion for a new trial basically set out two instances in which appellant could have been found negligent. The first instance would occur if appellant was directly negligent, to-wit: he failed to fulfill a duty to follow up, assuming such a duty was established. The second instance would occur through the imputation to appellant of any negligence on the part of the nurses. However, this latter duty would arise only if it were established that appellant had a right to control and direct the performance of the nursing home nurses. See Baird v. Sickler (1982),69 Ohio St.2d 652, 654-655 (holding that a physician can be held liable for the negligence of a nurse who is not directly employed by the physician when all the requisite indices of a master-servant relationship exist); See, also, Morris v. Children's Hosp. Med. Ctr. (1991),73 Ohio App.3d 437; Traster v. Steinreich (1987), 37 Ohio App.3d 99.
It is, therefore, apparent that two standards of care were at issue: (1) did appellant have a duty to follow up on his treatment orders; and (2) did appellant have the right to control or direct the actions of the nurses at the nursing home, beyond the issuance of treatment orders. A review of the trial transcript reveals that the evidence was in conflict as to the first issue, and that absolutely no evidence was presented concerning the second issue.
For instance, appellant was never asked whether he and the nurses at Wickliffe Country Place had a master-servant relationship, or whether he maintained some type of control or ability to direct the nurses' performance once treatment orders were given. No one else was asked about the relationship between a private physician and the staff of a nursing home or whether such a relationship was analogous to the relationship between a physician and the nursing staff at a hospital.
Much of appellees' argument at trial and on appeal attempted to meld a physician's ability to control and direct the performance of a nurse with a physician's duty to follow up on treatment orders issued to a nurse. As discussed, we see those concepts as being distinctly different. Proximate cause cannot be ascertained until a duty and a breach of this duty has been established. Consequently, by failing to present any evidence on the issue of the right of appellant to control and direct the performance of the nurses, appellees necessarily waived the issue of imputed negligence and any subsequent liability of appellant accruing under that concept. Specifically, if appellant did not have the right to control or direct the actions of the nurses beyond the issuing of treatment orders, there could be no negligence imputed to him if the nurses were negligent in failing to carry out his orders.
The only remaining theory was the existence of any direct negligence of appellant in failing to follow up on his treatment orders. As has been pointed out, there was conflicting credible evidence on that point. Thus, we determine that contrary to the trial court's assertion, appellees did not present "clear evidence of damages proximately caused by [appellant's] negligence." (Emphasis added.)There may have been clear evidence of damage, but there was not clear evidence of appellant's negligence.
Where conflicting testimony exists, the question of credibility of the witnesses is left to the jury for resolution, and the jury is free to reject some or all of the evidence presented by each side. In this case, the jury apparently rejected the expert testimony offered by appellees that the standard of care imposed a duty upon appellant to follow up on the orders given to the nurses at the nursing home. Arguably, the credibility assessment could have been predicated on the fact that appellees' expert witness, Dr. Lander, had no actual nursing home practice experience and was never an attending physician for a patient in a nursing home facility.[9]
On the other hand, appellant's expert witness, Dr. Baum, was a medical director at a local nursing home and also had private patients in nursing homes, including Wickliffe Country Place. Even if there is personal disagreement with the jury's assessment of credibility, neither the trial court nor this court should substitute its judgment for that of the jury under these facts.
Accordingly, we hold that the record in this case indicates that the jury's verdict was supported by competent, substantial, credible evidence on the issue of appellant's duty to follow up. We futher hold that, beyond the issuance of treatment orders, there was no evidence presented that appellant had the right to control and direct the performance of the nurses at the nursing home; hence, there was no evidence of imputed negligence. In light of this determination, this court need not consider the remaining issues posed by appellant in his lone assignment of error.[10]
Based on the foregoing analysis, appellant's single assignment of error is meritorious to the extent indicated. Accordingly, the judgment of the trial court is reversed, and the matter is remanded for entry of judgment consistent with the jury verdict returned in this case.
 ____________________________ JUDGE JUDITH A. CHRISTLEY
FORD, P.J., NADER, J., concur.
[1] With respect to this particular test result, appellant testified that while the nursing home's records indicated that on July 29, 1998, he was faxed the test results which indicated that the Coumadin level was still in "good therapeutic range," he was uncertain as to whether he actually received these results.
[2] Appellant explained that he had not visited with the decedent between July 29 and August 19, 1998, because under federal Medicare law, he was required to appear in the nursing home to check on his patient every thirty days, unless there was some significant change in her condition.
[3] According to appellant, at this point, the decedent's blood was at least three times thinner than it should have been.
[4] The trial court's order was predicated upon subsection (6) of Civ.R. 59(A), which states:
 "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
"* * *
 "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case[.]"
[5] Another argument posed by appellant under his sole assignment of error is that the trial court abused its discretion when it failed to make a jury question and the trial court's response a part of the record. Contrary to appellant's assertion, a review of the record shows that a copy of the jury question, along with the trial court's response, was included in the record before this court.
[6] During his testimony, appellant stated that he had admitting privileges at various hospitals and nursing homes, including Wickliffe Country Place.
[7] This responsibility was further explained by the expert testimony of Dr. Stephen Baum ("Dr. Baum").
[8] In Dr. Baum's experience, he has never contacted a nursing home to determine if routine testing was performed as ordered.
[9] According to Dr. Lander, he often cared for patients in the emergency room that were from nursing homes.
[10] The remaining arguments raised by appellant challenge the "right of control" jury instruction and the alleged lack of impartiality and bias on the part of the trial court judge.